# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JDS TECHNOLOGIES, INC.,
a Michigan corporation,

     Plaintiff.                       Case No. 15-10385

v.

AVIGILON USA CORPORATION,       HON. AVERN COHN
a Delaware corporation and AVIGILON   Special Master: Hon. Randall R.
CORPORATION, a Canadian corporation  Rader

     Defendants.

_____/

## Recommendation on Summary Judgment

Plaintiff JDS Technologies (JDS) filed a patent infringement suit against Avigilon USA Corporation and Avigilon Corporation (collectively, Avigilon), and a second suit against Exacq Technologies, Inc. JDS asserted the same two patents, U.S. Patent Nos. 6,891,566 (the '566 Patent) and 8,185,964 (the '964 Patent). Because JDS did not present adequate evidence to allow a reasonable jury to find infringement, this special master recommends that the court grant Avigilon's motion for summary judgment of non-infringement. Furthermore, this special master recommends that the court grant Avigilon's motion to limit under *Daubert* the testimony of Dr. Locke, JDS's expert, and to strike portions of his final declaration. This recommendation also addresses issues the parties raise about the scope of the first trial, limited to "direct infringement," and provide my recommendations about its scope.

## I.     The Pending Motions

On November 15, 2018, Avigilon moved for summary judgment, contending the two asserted patents are invalid and not infringed. (Doc. No. 121.) On that same date, Avigilon moved under Daubert to limit the testimony of Plaintiff's expert, Dr. Locke, to exclude testimony related to the "camera swap" test. (Doc. No. 122.) JDS opposed both Avigilon motions. (Doc. Nos. 130, 135.) On December 21, 2018, Avigilon replied and the parties filed a Joint Statement of Facts for Defendants' Motion for Summary Judgment. (Doc. Nos. 140, 141).

On March 14, 2019, the parties were heard on the summary judgment motion and Avigilon's Daubert motion. In addition, at my request, the parties filed supplemental briefing. As part of its submission, JDS included an April 4, 2019 declaration from Dr. Locke (the 2019 Locke Declaration). (Doc. No. 149, Ex. 4.) On April 12, 2019, Avigilon moved to strike the 2019 Locke Declaration, and included its own declaration from Shaun Marlatt (the 2019 Marlatt Declaration). (Doc. Nos. 158, 159.) JDS opposed the motion to strike and Avigilon replied on May 3, 2019. (Doc. Nos. 161, 163).

Accordingly, ready for my recommendation are Avigilon's motion for summary judgment of non-infringement and invalidity, its *Daubert* motion, and its motion to strike the 2019 Locke Declaration. As stated earlier more briefly, based upon the briefing, the hearing, and the post-hearing submissions, I recommend that: (1) Avigilon's motion for summary judgment of non-infringement be granted; (2) Avigilon's motion for summary judgment of invalidity be denied without prejudice; (3) Avigilon's *Daubert* motion be granted to exclude the "camera swap" evidence; and (4) Avigilon's motion to strike the 2019 Locke Declaration be granted (based in part on consideration of both the 2019 Locke Declaration and the 2019 Marlatt Declaration). The reasons for my recommendations follow. In addition, I have addressed the

parties' arguments over the scope of any trial on "direct infringement" and certain additional claim construction issues that appear to be implicated.

## II.    The Patents and the Claimed Inventions

The Court's Appointment and Order of Reference to Special Master (Doc. 74), appointed a special master to construe the claims. After another special master issued an initial Report and Recommendation on July 18, 2017, the parties filed objections and other briefing with the Court. Because those filings raised issues that had not been considered by that earlier special master, the Court directed that preparation of a supplemental report, which an earlier special master issued on December 8, 2017. (Doc. No. 73.) On April 19, 2018, the Court adopted that supplemental report. (Doc. No. 77.) The Court's constructions are not repeated except as noted but this special master has applied the claims as construed previously and adopted by the Court.

Much has already been written about the patents, an enormous number of claims have been construed more than once and those recommendations have been adopted by the Court. This recommendation incorporates by reference those earlier recommendations and decisions, but only includes the information needed to resolve the pending motions at this point.

The two asserted patents share a common specification and generally describe video surveillance systems. Figure 1 of the patents and the accompanying disclosure showed a prior art video surveillance system with, among other things, video cameras that could stream video to a networked computer and viewed on a user interface on the computer. Generally, the patents describe an improvement over the prior art systems that consists of a system that allows for approval of a video from a camera on a camera-by-camera basis. The general concept was for the computer to obtain from each camera a unique identifier and to approve streaming video

3

from that camera to a computer only if that unique identifier matched an approved identifier on a list. (*See generally,* '566 Patent 6:48-51.)

The paradigm claims are claims 1, 28, 29, and 49 from the '566 Patent and claims 1 and 4 of the '964 patent. The paradigm claims consist of claims to computer-readable media (CRM), methods, and systems. However, for simplicity and ease of reference, except when necessary the claims are discussed using terminology befitting system claims, and the accused products, methods, and systems are referred to as "systems." Likewise, although some claims refer to a "camera" and others to a "video server" for simplicity I will use the term "camera," because for purposes of this motion the difference between them is unimportant, with exceptions discussed below.

The patent specification describes two discrete steps pertinent here: (a) an "initialization" or "configuration" step (*see* '964 Patent at 6:19-38) and, "[t]hereafter," (*id.* at 6:39 (b) the "approval" or "authorization" step (*id.* at 6:43-56).

In the first step, which is described as being in the prior art, the claimed system obtains from a camera certain data including a unique identifier which can be its IP address or the camera's "embedded MAC address[]." (*Id.* at 6:37.) The prior art thus showed methods and systems to perform the initialization step and to do so using a unique identifier. For example, the patents themselves describe a prior art system that included the use of a camera on a network to display video to a computer by using a unique identifier. (*E.g., id.* at 1:63-3:13.) Indeed, the patents gave an example of a computer obtaining video from a camera by the user typing a unique identifier of a camera into a browser. (*See id.* 2:54-3:4 (IP address as example of unique identifier)).

After obtaining each unique identifier, the claimed system stores it for, among other things, use in the second step — "for purposes of validating access to the cameras identified in the database." (*id.* at 6:36-39.) Thus, in the claimed system, if a user requests that video from a camera stream to a computer, approval turns on whether that camera's unique identifier is in that database. The parties have referred to this as *comparing* a camera's unique identifier to a list (*e.g.,* a database) to determine whether to approve streaming video from that camera to a computer. (Hrg. Tr. 75:2-4, 76:5-10, 77:15-24.)

A significant amount of the briefing in this special master proceeding relate to this second step. Each paradigm claim requires that the system use a unique identifier of a camera to "validate," "determin[e]," "verify," or "enable" access to a server or camera before a computer will display video images from that camera. These terms and similar terms in each claim have been construed to mean "to approve or not approve" access to video feed from a camera and, further, the claims require that approval be determined on a camera-by-camera basis. (*E.g.,* Doc. No. 73 at 50-51; 86.) As construed, these claim terms require the system use a unique identifier in approving whether video available from a particular camera accessible to the computer (as a result of initialization in the first step) may be displayed on a computer (*i.e.,* on a user interface on a computer). (*See id.* 68-69; Doc. 77 at 12.)

To sum up, the claims require a system use a unique identifier in the second step, not merely the first. Conflating the two steps into one ignores the proper construction of the claims and renders the "approval" step superfluous, permits the claims to read on the prior art, and runs afoul of JDS's positions to avoid ineligibility under Section 101. With that summary of what has transpired so far, I turn to each Avigilon motion.

### III. Avigilon's *Daubert* Motion Directed to Portions of Dr. Locke's Report

The parties exchanged expert reports on October 31, 2018. On November 15, 2018, Defendants filed a *Daubert* Motion to Limit the Proffered Expert Testimony of C. Douglass Locke. (Doc. 122.) Avigilon pointed out various perceived deficiencies in the methodology and conclusions, including his failure to provide claim charts or an element-by-element mapping of each asserted claim onto each accused system, his failure to analyze source code in any substantive manner, and his failure to consider testimony that directly contradicted his inferences about how the accused systems worked. (*E.g., id.* at 5, 8.) In addition to pointing out that Dr. Locke's interpretation of the claims to not require complete systems contradicts his prior opinions and the construction of the Court (a point discussed more fully below), Avigilon moved to exclude the "camera swap test" discussed in paragraphs 110-118 of Dr. Locke's report, and its adoption by reference throughout his report. (*Id.* at 6 & n.6, 7 n.7.)

I recommend this aspect of the motion – striking opinions based upon the camera swap test – be granted. I find that the methodology underlying his opinions in that portion of his report is unreliable. Foremost, Dr. Locke did not rely upon source code at all, let alone for each accused system, for the vast majority of his conclusions about how the system operated during the camera swap and so the methodology is unreliable and not based upon facts. Without clear citation to source code, Dr. Locke cannot verify that step two of the claimed invention operates as claimed. Where he does refer in passing to source code, in paragraphs 119-120 (repeated or incorporated by reference elsewhere in his report), Dr. Locke does not explain – factually – how the source code works to implement the claimed invention or how it supports the conclusions he reaches from the camera swap test. There is no mention whatsoever of how ACC 5 and ACC 6 perform the "approval" method, and scant and scattered mention of the ACC 4 code.

I have considered the argument that JDS made in response, which is that in fact Dr. Locke had looked at the source code and Avigilon's "technical documentation" to support his interpretation of how an accused system operated. (Doc. 130). However, and as detailed below, the evidence put forward by Avigilon both prior to and after Dr. Locke's October 2018 report shows that there was and is not a *factual* basis in the code to support his opinion that the "camera swap" constitutes evidence that a reasonable jury could use to find the system uses a unique identifier to approve a video stream as the claims as construed require. These deficiencies also further undermine the reliability of his methodology, because they confirm that Dr. Locke had assumed the reason why video was not feeding from the detached camera was because the system had used a unique identifier to not approve the feed when, at best, that was one of several inferences, but not one based upon the source code for ACC 4 (and, again, there is no specific analysis of pertinent code from ACC 5 or ACC 6).

Dr. Locke cannot opine and JDS cannot argue that any source code provides the needed functionality based upon Dr. Locke's opinions based on what he saw in the user interface and his guess as to how the source code actually functions. The fact that the interface showed a camera was "not connected" does not show as a matter of fact that the source code did "not approve" video feed from the camera. As detailed more fully below, the evidence was that, had the camera not been properly "discovered" or if there had been an error, the same "not connected" display would have resulted, and so guessing what caused "not connected" to occur is not evidence of how, in fact, the system caused the video to be not approved to stream. (*See* Doc. 122 at 21.)

Despite having multiple opportunities to provide claim charts and specific citations to source code, JDS referred in opposition to materials "cited throughout the report," falling well

short of providing a verifiable methodology. (Doc. 130 at 5.) Further, unreliability of the methodology in the October 2018 Locke report is confirmed by the different positions about how the source code operates as put forward by JDS in the 2019 Locke Declaration, discussed below. Accordingly, this special master recommends excluding paragraphs 110 to 118 of the Locke report and the use of those paragraphs or conclusions as incorporated by reference elsewhere.

Avigilon also moved to exclude opinions in Dr. Locke's report that Avigilon directly infringes. There are three issues that need to be separated out.

The first issue is whether Avigilon itself made, used, or sold systems that directly infringe. Avigilon seems to concede that, at least at its Texas facility, it uses a complete system (which, presumably, it assembled), and I detect a disputed issue of material fact as to a few other systems. As a result, and without regard to the other recommendations in this section, I recommend denying the motion for summary judgment to this extent: Dr. Locke may testify as to direct infringement by Avigilon if at trial there is some evidence from which a reasonable jury could find that Avigilon has made, used, sold, or offered to sell a specific, complete system. At this point, this special master has not seen that evidence of Avigilon's offering and selling a complete system that may infringe for the reasons given in my recommendation to grant Avigilon's motion for summary judgment of non-infringement, however.

The second issue concerns whether Avigilon's sale of accused software on a computer readable medium can directly infringe certain claims, and the answer to that question relates to the third issue the parties have raised, the scope of the "direct infringement" trial. The sale of software on a computer readable medium (CRM) can infringe CRM claims, and Claims 1, 28, and 29 of the '566 patent are CRM claims. On the other hand, any such sales could not directly infringe the system of '566 patent Claim 49 or the methods of '964 patent claims 1 and 4. While

Avigilon has invited additional briefing on the scope of the CRM claims, for now it seems to be a tempest in a tea pot because, first, I recommend granting summary judgment of non-infringement and, second, if despite my recommendation there is a trial on direct infringement it is difficult to see how inclusion of these claims increases the scope of that trial much, if at all.

The third issue implicated by Dr. Locke's opinions about direct infringement, and that question more broadly, is whether the first trial is to include evidence that a system used by an Avigilon customer directly infringes, and whether that can be determined without including whether Avigilon is liable as an indirect infringer for inducement or contributory infringement. The parties addressed this issue at length at the March 2019 hearing.

Taken literally, because a system made, used, or sold by a third-party is not *Avigilon's direct* infringement, the actions of Avigilon's customers would not be within the scope of a trial on "direct infringement." However, limiting the first trial to whether an Avigilon system infringes while not considering whether a third-party system using Avigilon's software infringes seems wasteful: any second trial on third-party infringement would necessarily require much of the same evidence. At the same time, a finding that a third-party directly infringed would not mean Avigilon was liable for indirect infringement and, further it could be potentially prejudicial and confusing for a later jury to be told that an Avigilon customer has been found to infringe but then decide only whether Avigilon induced or contributed to that infringement and, again, much of the same evidence would appear pertinent to that issue.

Based on the hearing and briefing of the parties, it is unclear whether this potential prejudice, confusion, and waste were presented to the Court, or the degree to which subsequent events may alter the bifurcation decision. Accordingly, this special master recommends that, absent agreement by the parties and the consent of the Court, the first trial should *either* (a) be

limited to only direct infringement by any complete Avigilon systems made, used, sold, or offered for sale by Avigilon (excluding CRM claims) or, (b) if third-party direct infringement is included, JDS should be required to present its inducement or contributory infringement proof as part of that trial.

### IV. Avigilon's Motion to Strike the 2019 Locke Declaration.

As explained above, JDS submitted Dr. Locke's report in October 2018. In opposition to Avigilon's November 2018 motion for summary judgment, JDS filed a December 7, 2018 declaration from Dr. Locke. The parties then exchanged rebuttal reports on January 8, 2019, and the hearing was held on March 14, 2019 and Dr. Locke attended. After that hearing, JDS submitted the 2019 Locke Declaration.

I recommend granting Defendants' Motion to Strike the April 4th Declaration of C. Douglass Locke, Ph.D., Avigilon. (Doc. 158.) First, for the same reasons that paragraphs 110 to 118 in Dr. Locke's report are unreliable, so too are similar opinions in the 2019 Locke Declaration, and they are inconsistent with his October 2018 report (and so unreliable) and his generalized and new opinions are rendered more suspect in light of the more specific 2019 Marlatt Declaration. Second, Dr. Locke attended the March 2019 hearing and yet JDS did not at that time solicit from him and present at the hearing these additional arguments or clarifications so that Avigilon could respond to the matters fully addressed at the hearing.

Third, and related to that point, JDS could have asked my permission (at the hearing or after) to submit an additional expert report or declaration, or sought Avigilon's agreement to do so, and the scope and timing of those submissions could have been addressed (or permission denied). JDS elected not to do so. Indeed this special master perceives that JDS has offered a constantly shifting theory of infringement which has made assessment of the proffered evidence

difficult, and the 2019 Locke Declaration contains further shifts and changes. Years into this case, this 2019 Declaration contains new opinions and some of those opinions are inconsistent with the three prior submissions from Dr. Locke. (*See* Doc. 158 at 3-5.) At least paragraphs 16 to 17 of the 2019 Locke Declaration are new, based upon different evidence, or provide new and different opinions than Dr. Locke's three prior submissions. These new opinions were offered long after Avigilon had pointed out the deficiencies which the 2019 Locke Declaration seeks to correct, after three other submissions from Dr. Locke, and even after a full hearing. Thus, these opinions could have and should have been offered long ago.

Underscoring that point, Mr. Marlatt had been presented by Avigilon as a 30(b)(6) witness but, though deposing him, JDS did not ask about the source code in the 2019 Locke Declaration. Further still, JDS's submission of the 2019 Locke Declaration caused Avigilon to file an additional declaration from Mr. Marlatt to address Dr. Locke's new opinions. Finally, all of this new evidence did not come as the result of my request for additional expert reports or declarations. Moreover, JDS did not seek to modify the scheduling order to provide new evidence, and the time period for expert testimony and the full safeguards of depositions and inquiries had expired.

Thus, for those reasons, I find that considering the 2019 Locke Declaration would be prejudicial to Avigilon and is improper given the scheduling order, the hearing, and the procedures agreed upon by the parties. To hopefully avoid additional proceedings, however, I have considered the 2019 Locke Declaration and, because fairness requires it, I have also considered the 2019 Marlatt Declaration submitted by Avigilon.

### V.    Avigilon's Motion for Summary Judgment of Non-infringement and Invalidity

Summary judgment of invalidity may be granted only upon showing clear and convincing evidence of invalidity such that no reasonable jury could find otherwise. *See Tokai Corp. v. Easton Enterprises, Inc.,* 632 F.3d 1358, 1367 (Fed. Cir. 2011) (discussing summary judgment and the fact that "an accused infringer must prove invalidity by clear and convincing evidence."). In contrast, where a defendant seeks summary judgment of non-infringement, "nothing more is required than the filing of a... motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused [products] did not meet the claim limitations." *Exigent Tech. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1309 (Fed.Cir.2006). The burden of production then shifts to the patentee to "identify genuine issues that preclude summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.,* 469 F.3d 978, 990 (Fed.Cir.2006). Of course, the evidence of both invalidity and non-infringement must be viewed in the light most favorable to the non-moving party and all reasonable inferences resolved in its favor. *Novartis Corp. v. Ben Venue Laboratories, Inc.,* 271 F.3d 1043, 1046 (Fed. Cir. 2001) ("Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims.").

I have applied these well-known standards to Avigilon's motion for summary judgment. I note that Avigilon pointed to specific ways its systems do not infringe and provided evidence as to the functionality provided by its source code to negate infringement under even belated theories in the 2019 Locke Declaration. (*See, e.g.,* 2019 Marlatt Declaration.)

A.      **Avigilon's Motion for Summary Judgment of Non-Infringement**

1.      **Avigilon Met its Burdens of Production and Persuasion.**

In its motion, Avigilon admitted that, at least in some circumstances, its systems █████ ████████████████████████████████████████████████████████████ to "discover" whether a camera was physically networked ███████████████████████. (*E.g.,* Doc. 121 at 6-7.) However, JDS acknowledges that the systems ████████████████ in this manner satisfies the first step, but not — without more — the second. (*E.g.,* Hrg. Tr. 197:13-20.) Instead and as explained above, the paradigm claims require that the system █████████ ████████████ to approve video feed from a camera to a user interface on a computer.

Avigilon produced evidence that showed its systems █████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████. (Doc. 121 at 7; Doc. 151 at 4.) Somewhat oversimplified, ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

With that general background, the record showed that the accused systems first operate to "discover" any camera that is available to the network. (Gafford Nov. 15, 2018 Decl. ¶¶ 32-34.) Again, this aspect of Avigilon's accused system would be the first step described in the patent, and a step known in the prior art (e.g., '964 Patent at 2:1-14), initialization or configuration, or as Avigilon puts it, "discovery."

The accused system ███████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ . (*Id.*) The system ██████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ . (*Id.*)

Thus, Avigilon concedes (and seemingly has long conceded) that in some circumstances an accused system ███████████████████████████████████████████ ████████████████████████████████ to supply a video feed to a computer. Significantly, however, this evidence means only that video from the camera is accessible to the computer, not that the video from that camera is displayed on a computer. (*See id.* ¶¶ 32-42.) And, again, ██████████████████ to enable video to stream from a camera was known in the prior art.

To approve streaming of video from a particular camera to the user interface on the computer — in terms of the accused system, to "connect" a "discovered" camera — the accused system requires a second step. Specifically, to approve streaming of video from a discovered

camera, the system requires a user to select that camera (from a visible list) and request the system "connect" the camera to the computer. (*Id.* at ¶¶ 35-42.) If a user makes a request to connect a camera, the system's



. The camera then becomes "connected." At this point, video from that camera can be streamed to the user interface on the computer.  (*Id.*)

Thus, I find that Avigilon came forward with evidence that in the accused systems *approval* of streaming of a video feed ████████████████████████████████████

In addition to coming forward with this evidence to show that its systems did not infringe, Avigilon addressed the infringement arguments that JDS had made through Dr. Locke. I find that Avigilon showed Dr. Locke's opinions and the evidence he relied upon were insufficient for a reasonable jury to find that the accused systems perform the approval step as required by the Court's claim construction.  I explain in detail the basis for that conclusion below.

Finally, Avigilon showed there was no evidence it infringed '566 Claim 29 or '964 Claim 1 on the basis of a licensing device known as a "Network Video Recorder" or NVR.  (Doc. 121 at 10.) Specifically, Avigilon first showed that under Dr. Locke's opinion, the accused system

would not infringe either claim because approval occurs, ███████████████
███████ (*Id.* at 11.) Second, it showed Dr. Locke's theory that an NVR could infringe Claim 29 did not apply to Claim 29 because it is limited to "cameras" and an NVR is not a "camera." (*Id.* at 12.)

Avigilon thus plainly met its burden of production and persuasion of summary judgment of non-infringement, as to all claims and, for the additional reasons above, as to the claims limited to NVRs. As a consequence, unless JDS came forward with sufficient evidence for a reasonable jury to find infringement, summary judgment is proper.

> **2.      Even Considering the 2019 Locke Declaration and Viewing the Evidence in the Light most Favorable to it, JDS Failed to Produce Sufficient Evidence For a Reasonable Jury to Find Infringement.**

At the outset, JDS did not dispute that an NVR is not a "camera" and so summary judgment is appropriate as to '566 Claim 29 to the extent that JDS relies on Dr. Locke's "Infringement Example 2" because that claim is limited to "cameras." (*See* Doc. 135 at 9-10.)

Beyond that, as construed, each paradigm claim requires that the accused system use a unique identifier to approve video feed from a camera to a computer. Before turning to JDS's arguments that there is sufficient evidence from which a jury could find evidence the accused systems perform that step – what Dr. Locke termed "Infringement Example 1" – proof of infringement requires establishing that the system actually performs the approval step, and the need to do that through rigorous examination of source code is settled. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009) (affirming summary judgment of non-infringement of software-based claim because Defendant provided no analysis of source code of the accused products or identify the relevant algorithms). Further, Avigilon made source code available to Dr. Locke long ago. And, Avigilon presented Mr. Marlatt – its Software

Systems Architect – for deposition as its 30(b)(6) witness, and yet he was not asked specific questions about the source code and how the accused system discovers and connects cameras, nor about the source code Dr. Locke discussed as supporting his conclusions about how the accused system operated during the "camera swap test." And, in addition, Avigilon had provided specific evidence from Mr. Gafford pointing out other deficiencies in JDS' proof in November 2018 – before JDS's submissions in December 2018, January 2019, the March 2019 hearing, and its April 2019 submissions, including the 2019 Locke Declaration. (*See, e.g.*, Doc. 120-7 at ¶¶ 20, 29, 49.)

With that background, I turn to each of JDS's arguments, again noting that I would recommend excluding some of this, as stated above. Based on the record as a whole and including that evidence, I recommend the Court hold that JDS has not presented sufficient evidence from which a reasonable jury could find infringement.

First, JDS argued that infringement is established because a web browser on the same computer that happens to be running the accused software can stream video from a camera, but the accused system cannot. (Doc. No. 153 at 6.) Apparently, from this JDS infers that the accused system had "not approved" the camera for video feed. The portions of Dr. Locke's report cited in JDS's response do not mention this argument, let alone identify facts to support it, and so this is insufficient evidence of infringement. Further, it seems undisputed that, if in that hypothetical the camera had not been discovered by the accused system (again the prior art first step of the claimed invention), video from it would not stream. Thus, the failure to discover, not non-approval, is equally plausible, and so either conclusion is speculation – at best.

Second, although acknowledging the accused systems ███████████████████ ███████████████ (Doc. 135 at 4), JDS asserted there was sufficient evidence that the accused

systems ███████████████████████████████████████████████

████████████ (*See id.*) For example, JDS asserted that Dr. Locke had found evidence that the

███████████████████████████████████████████████████████" and that he

had "analyzed Avigilon's documentation and source code" which demonstrated that the accused

system ███████████████████████████████████████████████

███████████████████████████" (Doc. 135 at 5; *see id.* at 7-8.) JDS essentially

argued that the camera swap showed this, as did operation of the system during re-initialization,

and during "subsequent" or "on-going" use of a system.

I have considered all of the evidence relating to these issues, including both the 2019

Locke Declaration and the 2019 Marlatt Declaration. Based upon that, no reasonable jury could

find that ██████████████████████████████████████████████

████████████████████████████████████████████.

With respect to the camera swap test, I note that Dr. Locke's original report is in key

respects inconsistent with the 2019 Locke Declaration. Some inconsistencies are noted below,

and they render both opinions suspect.

In his October 2018 report, Dr. Locke explained that he had (viewing the evidence in the

light most favorable to JDS) personally set up a system that satisfied all other elements of a

paradigm claim, used it to initialize a camera, and then approved that camera to stream video to a

computer. (*See* Locke Rep. ¶ 116.) Then, he disconnected that camera and swapped it for a new

camera. (*Id.*) When he did so, no video streamed to the computer from that new camera. (*Id.* ¶

117.) From this, Dr. Locke inferred that the accused system must have ███████████████████

████████████████████████████████████████████████████, the

system did "not approve" a video feed from the new camera. (*See* Locke Rep**.** ¶ 117.)

In addition, Dr. Locke re-attached the original camera and a video feed resumed. From that fact Dr. Locke inferred that the system must have ███████████ to approve the feed. (*See* Locke Rep. at ¶ 118.)

Significantly, Dr. Locke inferred how the system operated based upon what he saw on the screen, not on an analysis of the code. Only in two brief paragraphs did he mention analyzing the source code, stating that the inferences he had reached were "confirmed" by his review of numerous lines of source code, but provided only a few generalized sentences to support his opinion that some or all of that cited source code "confirmed" his opinions. (*Id.* ¶¶ 119-20.)

In contrast, Avigilon specifically stated that no source code would have caused the system ███████████████████████████, nor was that the cause of why the reattachment caused the video to resume. (*See* November 15, 2018 Gafford Decl. ¶¶ 29, 49.) Mr. Gafford explained that the system had used the source code cited by Dr. Locke ███████████████ ███████████████████████ caused an error, and not non-approval of the new camera, and that is why no video streamed from the new camera. (*Id.* ¶ 49.) Further, he explained that, if the system had been used to discover that new camera, then it could have been approved and video would have resumed. In other words, the fact that the new camera had not been discovered ████████████████ ███████████████ (*See id.* at ¶¶ 49-52; *see also* 2019 Marlatt Decl. ¶¶ 3-14.)

Thus, Avigilon produced evidence that the fact that the new camera would not stream is because the new camera ███████████████████████ ███████████████. Without an adequate response to this explanation from

Avigilon, then, Dr. Locke chose to summarily adopt one of two reasonable inferences. This unsupported assumption or adoption was overt speculation and guesswork in choosing between at least two reasonable inferences. *See Deckers Outdoor Corp. v. U.S.*, 714 F.3d 1363, 1372 (Fed. Cir. 2013); *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010) ("[a]n unsupported opinion... cannot and does not create a genuine issue of material fact"); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment"); *Auto. Techs. Int'l., Inc. v. Delphi Corp.,* 776 F. Supp.2d 469, 478 (E.D. Mich. 2011) (expert declaration did not create a dispute of material fact).

Further, Avigilon demonstrated that Dr. Locke's inference was not reasonable. It produced evidence that . (*See* 2019 Marlatt Decl. ¶¶ 4-11; Gafford Decl. ¶ 50.) Thus, Avigilon through direct testimony and the source code showed the systems ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Thus Avigilon presented unrebutted testimony that its source code does not employ the infringing system.

With respect to Dr. Locke's inference that the system ▮▮▮▮▮▮▮▮▮▮▮▮ because, once the original camera was re-attached, video streaming restarted, Avigilon showed the system ▮▮▮▮▮▮▮▮▮▮▮▮. (*See, e.g.,* Gafford Decl. ¶¶ 45-48.) Thus, if anything, this aspect of the camera swap evidence confirms that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

While Dr. Locke *opined* differently, he did not explain how his opinions were based upon the actual code. Particularly in light of Avigilon's contrary evidence that its source code does not employ the claimed methods and systems, Dr. Locke's naked and factually unsupported opinion is not a reliable basis for a reasonable jury to find the system ███████████████████ ██████████. *See Lucent Techs., Inc.*, 580 F.3d at 1340 (Defendant did "nothing more than demonstrate that the accused products reach the same result). As a result, the record contains no evidence from which a reasonable jury could find the system ████████████████████ ████████████ as a result of the "camera swap." Further, if video did not stream because the camera had not been configured properly (*i.e.,* it had not been discovered), then a prior art system would have, for the same reason, not streamed video.

In addition to the camera swap, JDS asserted that the accused system ███████████ ███████████████████████████████████████ to determine whether to enable or disable video." (Doc. 153 at 10.) The evidence it cites at this point from Mr. Gafford, however, relates to ██████████████ in the first step (as noted repeatedly, this first step is already disclosed in the prior art), not the second.

JDS also argued, more broadly, that there was evidence that the system made "regular determinations" to approve video by ██████████████, asserting Dr. Locke had identified source code that provided that functionality. (Doc. 153 at 11.)

First, JDS pointed to the 2019 Locke Declaration and █████████████████ ████████████████████████████████████████████. (2019 Locke Decl. at ¶ 17.) Previously, Dr. Locke had never opined that ██████ related to approval of streaming. (*See* Locke Rep. ¶97, 190.) Thus, not only is this proffer belated, his previous opinions undermine his April 2019 conclusion that █████████████████████

██████████████████████████. Further still, after JDS made this new assertion, Avigilon produced specific evidence that ████████████████████████████████████ ██████████████████████████. (2019 Marlatt Decl. ¶¶ 11-13.) Thus, even though I recommend excluding the 2019 Locke Declaration, even if considered the new opinions are, at best, unreliable and insufficient for a reasonable jury to find that ███████████████ ████████████████████████████

In addition, JDS relied on Dr. Locke's opinion that – after a system has been initialized and a camera approved to stream – if the system were restarted, the system would ███████████ ████████████████████████████████████████████. Dr. Locke in April 2019 for the first time pointed to ██████████████████, again a belated assertion that I recommend excluding. Further, he did not explain how that code actually performs this function instead pointing to paragraphs of his October 2018 report that do not mention it.

Faced with this new argument, Avigilon provided specific evidence that ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████. (2019 Marlatt Decl. ¶ 15.) ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████. (*See id.*; *see also* Gafford Decl. ¶ 50.)

I have considered the variations on the arguments above – ██████████████████ ████████████████████████████████████. Often, JDS has conflated

████████████████████████████████████████████████, or has failed to provide

specific evidence to support its argument or Dr. Locke's opinion. Although I have not

mentioned each of its many arguments, the record before me leads to the following conclusions:

- ████████████████████████████████████████████
  ████████████████████████████████;

- ████████████████████████████████████████████████
  ████████████████████████████████████;

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████.

In sum, because I conclude that Avigilon met its burden to show no reasonable jury could

find infringement, and JDS failed to produce sufficient evidence for a reasonable jury to find

infringement, I recommend that Avigilon's motion for summary judgment of non-infringement

be granted.


**B.      Avigilon's Motion for Summary Judgment of Invalidity.**

I have been guided by the concept that where a proper and reasonable interpretation

avoids invalidity, that interpretation should guide. As indicated above, at times JDS construes

the approval step in a way that would cover prior art systems. Finding infringement based upon

████████████████████████████████████████████████████████, for

example, would create serious invalidity questions. For example, to the extent that the claims are interpreted as broad enough to embrace infringement of a system that ██████████████████ ███████████████████████████████████████████████████, then the claims would likely be invalid in light of the prior art recited in the patent itself.

Further, some of JDS' arguments to show infringement run afoul of positions taken by JDS to avoid ineligibility under Section 101. *See ChargePoint, Inc. v. SemaConnect, Inc.,* 920 F.3d 759 (Fed. Cir. 2019). For example, to the extent the claimed invention is interpreted as merely a simple computer function of checking a list created in step one, then JDS would likely fall from the careful tightrope it walked to avoid abstractness and conventionality concerns raised earlier in this case. *JDS Techs., Inc. v. Exacq Techs.,* 2016 WL 3165724, at *7 (E.D. Mich. June 7, 2016) ("Here, up to the time of the invention, no one queried digital cameras and video servers for an embedded code (the MAC address) for the purpose of restricting access and protecting the software on a different device. The technological solution presented is inexorably tied to computer technology and prevents abuse by controlling when and how external devices are allowed to operate within a video surveillance system that includes software, creating an effective and desired anti-piracy solution for the software."). Therefore, because JDS had to toe a very narrow line to overcome the Section 101 challenge, this decision recommends that Avigilon has shown on the record that its system does not infringe.

Accordingly, the Special Master recommends entering final judgment of non-infringement in favor of Defendants. The Special Master also recommends the Court deny, without prejudice, Defendants' motion for summary judgment on invalidity, grant their motion to limit Dr. Locke's testimony, and grant their motion to strike certain testimony from Dr. Locke.

Finally, the Special Master recommends the scope any bifurcated first trial, if needed, be

reassessed in light of the issues discussed above.


Randall R. Rader
Special Master


Dated: 6/17/2019